626 A.2d 946

**Cecil E. HARRIS**

v.

**STATE of Maryland.**

**No. 48, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 28, 1993.

138

140

Jack B. Rubin (Jack B. Rubin, P.A., on brief), Baltimore, for appellant.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

We granted certiorari in this case to consider whether under Maryland Code (1957, 1992 Repl.Vol.) Article 27,

§ 281A(b), a firearm is "used" during and in relation to a drug trafficking offense when it is neither actively employed nor brandished.[1] 327 Md. 304, 609 A.2d 312. In addition, because we granted certiorari prior to argument or decision by the Court of Special Appeals, we must address two other issues. One involves the application of Maryland Rule 1–351, which pertains to *ex parte* orders. The other involves the propriety of the trial court's allowance of cross-examination of the appellant concerning the defendant's income and Maryland State income tax returns.

## I.[2]

Cecil Harris, the appellant, was convicted by a jury in the Circuit Court for Baltimore City of possession of cocaine in sufficient quantity to indicate an intent to distribute, possession of marijuana, and feloniously using, wearing, carrying, or transporting a firearm, to wit, an Uzi semi-automatic 9mm assault firearm, during and in relation to a drug trafficking crime.[3] He was sentenced to concurrent terms of imprisonment—ten years for the cocaine charge, six months for the marijuana charge and ten years without parole for use of the

---

1. The Court of Special Appeals decided *Rich v. State*, 93 Md.App. 142, 154–61, 611 A.2d 1034, 1039–43 (1992) after we granted certiorari in the instant case. In that case, the intermediate appellate court held that a defendant "uses" a firearm during and in relation to a drug trafficking offense within the contemplation of Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 281A(b), whenever the firearm in any way facilitates a drug offense, even when it is neither actively employed nor brandished.

2. Our statement of facts is taken largely from the parties' agreed statement of facts.

3. Maryland Code (1957, 1992 Repl.Vol.), Article 27, section 281A(b) provides,

 "(b) *Unlawful acts; penalties.*—During and in relation to any drug trafficking crime, a person who uses, wears, carries, or transports a firearm is guilty of a separate felony...."

 "Drug trafficking" crime is defined as "[a]ny felony involving the possession, distribution, manufacture, or importation of a controlled

firearm.[4] The charges arose out of the Baltimore City Police Department's execution of a search and seizure warrant, at premises at which the appellant maintained a part-time residence and, out of which, he had, at one time, operated a restaurant and car repair business.

The appellant and three others were found on the first floor, seated on the sofa in the living room. Neither weapons nor drugs were found on that floor or on the person of the appellant and his companions. All of the drugs and weapons were found on the second floor. In a hallway closet, 96.6 grams of 70% pure cocaine, valued at $36,000, were found in the false bottom of a "Fix–A–Flat" container. Eleven bags of cocaine and a bag of marijuana were found in the pocket of a man's leather jacket, which was located in the middle room closet. The Uzi semi-automatic 9mm firearm was seized, in plain view, from the appellant's room, the front bedroom. In that same room, the police recovered a loaded .357 handgun which was stuffed between pillows in a couch and three unloaded shotguns, all located in the closet. A .22 caliber Derringer handgun containing one round, was found in a drawer of the dresser in that room. The appellant owned all of the firearms.

The State offered expert testimony as to the significance of the evidence recovered. According to Officer Glenn Williams, to whose qualifications in narcotics investigation the parties stipulated, the quantity and purity of the cocaine found in the

dangerous substance under §§ 286 and 286A of this article" or "[c]onspiracy to commit any felony involving possession, distribution, manufacture, or importation of a controlled dangerous substance under § 286 and 286A of this article." Md.Code (1957, 1992 Repl.Vol.) Art. 27, § 281A(a)(2)(i) and (ii). The appellant does not dispute that he was charged with drug trafficking crimes.

4. Section 281A(b)(1)(i) provides for a sentence of not less than 5 years nor more than 20 years, for a first offense, while § 281A(b)(1)(ii) makes it "mandatory upon the court to impose no less than the minimum sentence of 5 years, no part of which may be suspended and the person may not be eligible for parole except in accordance with the provisions of Article 31B, § 11 of the Code." That minimum mandatory sentence is doubled when the firearm, is like the "Uzi 9 mm in any format (micro, carbine, rifle)," one of a list of specified firearms.

Fix–A–Flat can indicated distribution rather than personal use. He also testified that the premises was a narcotics stash house, in which guns are ordinarily kept to protect the narcotics from rival dealers and police. That was the purpose of the Uzi found in appellant's bedroom, Officer Williams opined.

Testifying in his defense, the appellant described the businesses he operated at the premises as a carry-out restaurant and a mechanic shop and a tire shop. Although the carry-out had been closed, he testified that he made some money in that store.

On cross-examination, the appellant testified that he supported himself from the proceeds of his businesses. He characterized his car repair business as profitable, as long as his physical condition permitted him to work, and his carry-out restaurant business as doing pretty well. This prompted inquiry concerning his income, his 1989 and 1990 taxes, and his expenses, generally. The appellant's 1989 and 1990 Maryland tax returns, showing income of $2,909 in 1989 and $18,441 in 1990, which were admitted into evidence, formed the basis for much of the questioning. The appellant objected to being questioned about the tax returns and to their admission in evidence. On redirect, as he had also done on cross-examination, the appellant testified to having other income from insurance and disability payments.

The appellant's tax returns were obtained during the course of the trial. The prosecutor obtained a court order for their disclosure without notice first being given to the appellant that they were being sought. Neither was the appellant or his counsel present when the State presented the court with the petition and order.[5]

## II.

■ Section 281A(b), by its plain language, makes it a crime for a person to use or to wear, carry or transport a

---

5. Those facts relating to the appellant's cross-examination about his financial condition and the State's obtaining his income tax returns, while agreed, are not intended to be exclusive.

firearm during, and in relation to, a drug trafficking crime. There are three prerequisites: the firearm must be 1) used, worn, carried or transported, 2) during a drug trafficking crime, and 3) in relation to it. One who uses or wears, carries or transports a firearm during a drug trafficking crime is not guilty of a violation of section 281A(b) unless the evidence also establishes that the use, wearing, carrying or transporting was in relation to that crime.

 While penal statutes are to be strictly construed against the State and in favor of the defendant, *State v. Kennedy,* 320 Md. 749, 754, 580 A.2d 193, 195 (1990); *Davis v. State,* 319 Md. 56, 61, 570 A.2d 855, 858 (1990); *Wynn v. State,* 313 Md. 533, 539, 546 A.2d 465, 468 (1988); 3 Norman J. Singer, *Statutes and Statutory Construction,* § 59.03 (4th ed. 1986), so that only punishment contemplated by the words of the statute is meted out, *Davis,* 319 Md. at 61, 570 A.2d at 858, the construction to be given a statute must depend upon discerning the intention of the Legislature when it drafted and enacted it. *Kennedy,* 320 Md. at 755, 580 A.2d at 196. This requires reading and interpreting the entire statute, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used. *Bd. of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982); *Smelser v. Criterion Ins. Co.,* 293 Md. 384, 389, 444 A.2d 1024, 1027 (1982); *Pappas v. Pappas,* 287 Md. 455, 465, 413 A.2d 549, 553 (1980). Moreover, construction requires that the statute be given a reasonable interpretation, not one that is illogical or incompatible with common sense. *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985); *Erwin and Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985).

 Our inquiry into legislative intent begins with the words of the statute and, ordinarily, will also end there. Where the words of the statute are clear and unambiguous, there usually is no need to go further in construing the

statute, *Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481, 485
(1991); *G. Heileman Brewing Co. v. Stroh Brewery Co.,* 308
Md. 746, 755, 521 A.2d 1225, 1230 (1987); *In re Criminal
Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976, 982
(1986); *Comptroller of Treasury v. Fairchild Industries, Inc.,*
303 Md. 280, 284, 493 A.2d 341, 343 (1985). Giving the words
their ordinary and common meaning "in light of the full
context in which they appear, and in light of external manifes-
tations of intent or general purpose available through other
evidence," *Dickerson v. State,* 324 Md. 163, 170–71, 596 A.2d
648, 651–52 (1991), quoting *Cunningham v. State,* 318 Md. 182,
185, 567 A.2d 126, 127 (1989), normally will result in the
discovery of the Legislature's intent. *State v. Bricker,* 321
Md. 86, 92, 581 A.2d 9, 12 (1990). In the interest of complete-
ness, however, we may look at the purpose of the statute and
compare the result obtained by use of its plain language with
that which results when the purpose of the statute is taken
into account. *Sabatier v. State Farm Mut. Auto. Ins. Co.,* 323
Md. 232, 250, 592 A.2d 1098, 1107 (1991); *Mustafa,* 323 Md. at
73, 591 A.2d at 485; *Baltimore County Coalition Against
Unfair Taxes v. Baltimore County,* 321 Md. 184, 203, 582 A.2d
510, 519 (1990); *Cunningham,* 318 Md. at 185, 567 A.2d at
127; *Kaczorowski v. Mayor and City Council of Baltimore,*
309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987). We may
also consider such evidence as "a bill's title and function
paragraphs, amendments that occurred as it passed through
the legislature, its relationship to earlier and subsequent
legislation, and other material that fairly bears on the funda-
mental issue of legislative purpose or goal...." *Wynn,* 313
Md. at 539, 546 A.2d at 468, quoting *Kaczorowksi,* 309 Md. at
515, 525 A.2d at 632–33. And we may look to the Court's
interpretation or treatment of another statute treating the
same or similar subject matter. *Bridges v. Nicely,* 304 Md. 1,
10, 497 A.2d 142, 146 (1985).

## A.

The appellant insists that the evidence in the case *sub
judice* showed only that he possessed the firearm and that the
General Assembly did not make it a crime to possess a firearm

during and in relation to a drug trafficking crime. The language of section 281A(b), the appellant argues, is plain and unambiguous, and in that regard, cannot be construed to cover mere possession. He posits that "possession" and "use" have different meanings; while one necessarily possesses a firearm while using it, it is not necessarily true that one who possesses a firearm also uses it.

The State does not dispute, nor can it, that the appellant was not wearing, carrying or transporting[6] a firearm during and in relation to a drug trafficking crime; direct evidence established that no firearms were found on the appellant and, in fact, that the only firearms recovered were located on the second floor, one floor removed from the appellant. The State does argue, however, that the appellant "used" a firearm during and in relation to a drug trafficking crime. It concedes that section 281A(b) does not punish the mere possession of a firearm, unrelated in any way to a drug trafficking offense. Nonetheless, specifically, citing *Rich v. State*, 93 Md.App. 142, 154–61, 611 A.2d 1034, 1039–43 (1992), the purpose of the Drug Kingpin Act, and the cases construing the federal statute, which is similar to section 281A(b), the State, argues that it does not follow that the statute requires proof of the active use or brandishment of a firearm. As the State sees it, the statute ought to be read so as to encompass any case in which a firearm in any way facilitates a drug offense. In other words, the State urges us to construe the statute so that it covers the drug dealer who keeps a firearm accessible to protect his drugs.

### B.

In *Wynn v. State*, 313 Md. 533, 543, 546 A.2d 465, 470 (1988), this Court defined "use." At issue in that case was the

---

**6.** "Wear" has been defined as "to bear or have upon the person; ... to have attached to the body or part of it...." *Webster Third New International Dictionary*, 2589 (unabridged 1986). *Black's Law Dictionary* defines "carry" as "[t]o have or bear upon or about one's person, as a watch or weapon...." *Black's Law Dictionary*, 214 (6th ed. 1990). "Transport" is defined as "[t]o carry or convey from one place to another." *Id.* at 1499.

interpretation of Md.Code (1957, 1982 Repl.Vol., 1986 Cum. Supp.) Art. 27, § 36B(d), which proscribes the "use of a handgun in the commission of a felony or crime of violence," a crime very much like that proscribed by section 281A(b). In *Wynn,* the defendant was carrying a loaded .38 revolver during a housebreaking, a crime of violence. *See* Md.Code (1957, 1992 Repl.Vol.) Art. 27, § 441. Although the evidence did not establish that he actively employed or brandished the handgun while engaged in the housebreaking, he was charged with "using" the handgun during its commission. 313 Md. at 535, 546 A.2 at 466. Favorably citing the Supreme Court of California's interpretation, we defined "use" as " 'to carry out a purpose or action by means of;' to 'make instrumental to an end or process;' and to 'apply to advantage.' " 313 Md. at 543, 546 A.2d at 470, quoting *People v. Chambers,* 7 Cal.3d 666, 672, 102 Cal.Rptr. 776, 779–80, 498 P.2d 1024, 1027–28 (1972). We held that, by possessing the gun while committing the crime of housebreaking, the defendant did not "use" the gun, as the Legislature contemplated when it enacted section 36B(d); rather, we said, what he did constituted the lesser crime proscribed in section 36B(b), "wearing, carrying, or transporting any handgun." *Id.* at 544, 546 A.2d at 471.[7]

In reaching this conclusion, we did not confine our analysis to the words of the affected section. Rather, taking to heart the lesson of *Kaczorowski* that " 'the search for legislature intent is most accurately characterized as an effort to discern

---

7. Other jurisdictions also define "use" as requiring more than possession of the firearm. *See Jordon v. State,* 274 Ark. 572, 626 S.W.2d 947, 950 (1982) ("Use of the verb 'employed' rather than 'in possession' compels us to conclude the Arkansas General Assembly intended something more than mere possession"); *People v. Funtanilla,* 1 Cal.App.4th 326, 331, 1 Cal.Rptr.2d 875, 877 (1991) (" '[U]se' means more than possession of a weapon or the bare potential for use. . . ."); *People v. Hines,* 780 P.2d 556, 559 (Colo.1989) ("Use" is broad enough to include act of holding weapon in presence of another in manner that causes other person to fear for his safety); *Buschauer v. State,* 106 Nev. 890, 804 P.2d 1046, 1049 (1990) ("Use" of a weapon "in the commission of a crime"—indicates that the instrumentality must be used in conscious furtherance of a crime); *State v. Chouinard,* 93 N.M. 634, 603 P.2d 744, 745 (1979) ("Use" is different from "possession.").

some general purpose, aim, or policy of the statute,' " *id.* at 539, 546 A.2d at 468, quoting *Kaczorowski,* 309 Md. at 513, 525 A.2d at 632, we examined the whole of section 36B, of which section 36B(d) was only a part, in an effort to discover the policy underlying it and "to harmonize the language in question in that context." *Id.* at 540, 546 A.2d at 469. As to the former, we said:

In examining the preamble we note that the legislature specifically distinguished between the *wearing, carrying, and transporting* of handguns and the *use* of handguns in criminal activity. In particular, in § 36B(a)(ii) the legislature emphasized that the increase in the number of persons killed or injured by handguns was directly related to the carrying of handguns by persons inclined to use them in criminal activity. This comment clearly indicates that the legislature considered the use of a handgun to be something more than mere illegal possession of a handgun and that the legislature contemplated use of a handgun in an active as opposed to a passive manner. Death and injury do not arise from a handgun which remains holstered.

*Id.* at 541, 546 A.2d at 469.

Next, the Court considered the substantive provisions of the statute and found them to be inconsistent with giving the term "use" a meaning equivalent to bare possession. 313 Md. at 541, 546 A.2d at 469. Focusing particularly on section 36B(b), we observed that it prohibits the unlawful wearing, carrying or transporting of handguns and provides for enhanced penalties based on the particular defendant's criminal history. Moreover, the *Wynn* court made specific mention of the enhanced punishment provided by section 36B(b)(iv), when the evidence establishes that the purpose for which the defendant was wearing, carrying or transporting the handgun was to injure or kill another person. *Id.* at 541–42, 546 A.2d at 469. Finally, we recognized the relative severity of the prescribed penalty, in section 36B(d), for "use" of a handgun, in contrast to that prescribed by section 36B(b). *Id.* at 542, 546 A.2d at 469–70. From that contrast we concluded:

The separate treatment of the carrying and wearing of a handgun in one instance, and use of a handgun in another, convinces us that if the legislature had intended for use of a handgun to encompass the conduct in this case it would have expressly so provided. *As we see it, the legislature would have drafted § 36B(d) so as to specifically proscribe the "carrying, wearing, transporting, or use" of a handgun in the commission of a crime of violence.*

313 Md. at 542, 546 A.2d at 470 (emphasis added). *See also Webb v. State*, 311 Md. 610, 617, 536 A.2d 1161, 1165 (1988), in which, discussing section 36B(b), this Court said, "In addition to the handgun use prohibition, the Legislature enacted § 36B(b) ... [and] [t]he unit of prosecution of that continuing crime is the wearing, carrying, or transporting of any handgun.... There is no requirement as to ... use...."

Our opinion in *Wynn* was filed September 1, 1988. The Drug Kingpin Act, of which section 281A(b) is a part, *see* Ch. 287, Acts of Md. 1989, was enacted May 19, 1989, effective July 1, 1989. Therefore, when it was passed, the Legislature knew, or, at least, is presumed to have known, how we had defined "use." *See State v. Bricker*, 321 Md. 86, 93, 581 A.2d 9, 12 (1990); *Mayor and City Council of Baltimore City v. Hackley*, 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). Possessed of that knowledge, the Legislature's proscription of "use" without any clear indication that it intended that a different meaning be given the term leads inevitably to the conclusion that it adopted the definition we had theretofore given it.

## C.

As we have indicated, section 281A was enacted in 1989 as part of the Drug Kingpin Act. *See Williams v. State*, 329 Md. 1, 3, 616 A.2d 1275, 1276 (1992). Its purpose was "to reduce the supply of drugs in Maryland by establishing harsher penalties for drug dealers and by decreasing the profitability of participation in a drug trafficking crime." Floor Report for S.B. 400. That purpose is similar to that attending the

passage, in 1971, of the Maryland Controlled Dangerous Substance Act: "to turn the screw of the criminal machinery— detection, prosecution and punishment—tighter and tighter." *Cunningham v. State,* 318 Md. 182, 189, 567 A.2d 126, 129 (1989), quoting *Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275, 284 (1981).

As initially proposed, *see* S.B. 400 and H.B. 502, it was contemplated that section 281A(b) would punish anyone who "uses or possesses" a firearm during or in relation to a drug trafficking crime. The briefing document that accompanied the Senate and House bills explained the reason for using that language and its contemplated effect:

1. Why is it necessary to establish that use or possession of a firearm be a separate offense when Article 27, § 36B, already makes it unlawful to use a handgun in the commission of a felony or crime of violence?

The current statute is restricted to handguns. The proposed bill would include all firearms. Many drug dealers are using automatic weapons, assault rifles and other firearms that may not fall within the current definition of handgun. In addition Article 27, § 36B prohibits the "use" of a handgun. In the *Wynn* case, the Court of Appeals made it clear that "use" does not pertain to an individual who merely possesses a firearm for possible further use. The language in this bill prohibits anyone to "use or possess" a firearm during and in relation to a drug trafficking crime. It would affect an individual who carries a handgun while dealing drugs, even though he does not use it.

2. Wouldn't this provision make it possible for a person to be convicted, if they distributed a small quantity of marijuana downstairs and had a shotgun on the wall upstairs?

No. The statute provides that the firearm must be used or possessed "during and in relation to a drug trafficking crime." That provision requires that a nexus be shown between the use or possession of a firearm and the drug trafficking crime. If the State cannot establish that the gun was being used or was kept for the purpose of being used to

further the drug trafficking crime, then the possession of
the firearm would not be covered by this provision.

It also reflects that the Legislature was very much aware of
*Wynn* and its recognition that "use" differs from "possess".
According to the Conference Committee Report for S.B. 400,
the House Judiciary Committee proposed amending section
281A by simply deleting "possesses;" however, that proposal
was rejected by the Conference Committee. While that Com-
mittee did delete "possesses," in its place it added "wears,
carries, or transports."

■■■■ By deleting "possesses," and replacing it with "wears,
carries, or transports," terms that, while less active than
"use," are more active than "possesses", the Legislature clear-
ly expressed an intention to require, for conviction, something
more than the mere possession of a handgun during and in
relation to a drug trafficking crime. Had the punishment of
one who possesses a firearm during and in relation to a drug
trafficking crime been the Legislature's goal, it would not have
been necessary for it to delete that term.[8]

---

**8.** The State argues that it is clear that, even in the original bill,
possession was criminal only when it was "during and in relation to"
the drug trafficking offense. It asserts that possession of a firearm
during and in relation to an offense is more than "mere" possession;
thus, there was never a need to eliminate the word, "possesses," to
avoid the prospect that the statute might be construed to cover cases in
which there was no connection at all between the firearm and the drug
offense. Therefore, it adds, it is not logical to interpret the elimination
of "possesses" from the statute as an indication that the Legislature
intended "uses" to mean "actively uses" as opposed to mere possession.

We agree that, even under the original proposed version of § 281A(b),
possession of a firearm during and in relation to the drug trafficking
crime was required. We do not agree, however, that the same con-
struction obtains after the deletion of "possesses" as obtained before its
deletion. As the briefing document indicates, by using "possesses"
along with "uses," the Legislature intended to reach conduct which we
held in *Wynn* was not covered simply by the word "use." The deletion
of "possesses" and replacing it with other, more limited terms, must
have some effect; it certainly could not mean the same thing as it did
before. In light of the deletion, to read the statute as the State proposes
would be to create a crime, possession of a firearm in relation to a drug
trafficking crime, not prescribed by the Legislature. *See Patuxent Inst.
v. Hancock*, 329 Md. 556, 575, 620 A.2d 917, 926 (1993) (it is a cardinal

 By inserting "wears, carries or transports," the terms used in section 36B(b), the Legislature made section 281A(b) the near equivalent of the combined effect of sections 36B(b) and 36B(d). Consequently, the State finds significant the statement in *Wynn* that, had the Legislature intended that "use" cover the conduct in that case, it would have

> "specifically proscribe[d] the 'carrying, wearing, transporting, or use' of a handgun in the commission of a crime of violence."

313 Md. at 542, 546 A.2d at 476. The *Wynn* Court was not suggesting, by that statement, that the definition of "use" would change if the terms "wear, carry, or transport" were inserted in subsection (d). As we have seen, the Court held in *Wynn* that "use" means something different from the conduct characterized by "wear, carry or transport." In that case, that conduct was the equivalent of "mere possession" of a handgun; by having the gun on his person during the housebreaking the defendant possessed it. Thus, the court was simply recognizing that including those terms in subsection (d) expanded the conduct prohibited from that characterized by the active term, "use," to include that characterized by the less active terms, "wear, carry or transport." No different result is required in this case. The definition of "use" in section 281A(b) is not changed from that announced in *Wynn,* and, certainly, is not diluted, simply because it is coupled with

---

rule of the penal system that a criminal defendant is entitled to be informed of what the state commands or forbids).

Additionally, the State, citing *Rich,* 93 Md.App. at 153–57, 611 A.2d at 1039–41, maintains that § 281A(b) was passed in order to combat the result reached in *Wynn:* the distinction arising from the statutory separation between "use" in § 36B(d) and "wear, carry or transport" in Section 36B(b). The legislative history does not indicate that the purpose in passing § 281A was to avoid the impact of the decision in *Wynn.* It indicates just the opposite. Additionally, the Legislature is presumed to be aware of the decisions of this Court. *See State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990); *Mayor and City Council of Baltimore City v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). The Legislature has not taken any action to define or, for that matter, redefine the term "use"; thus, it may be presumed that it is satisfied with the meaning we have given that term.

"wear, carry, or transport." All that means is that the conduct prohibited includes conduct other than "use," conduct which the State concedes is not implicated in this case.

In conclusion, the context in which the charged offense arose in *Wynn* is critical. Wynn was in possession of the handgun, *i.e.*, he wore, carried or transported it. Here the State does not even argue that the appellant wore, carried, or transported the firearm; it argues only that he possessed it in relation to a drug trafficking offense; hence, he "used" it.[9]

## D.

The State seeks support for its argument in the federal counterpart to section 281A(b), 18 U.S.C. § 924(c)(1) (1979, 1993 Cum.Supp.) and the cases interpreting it. That statute provides:

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years. . . .

Although it has not addressed the issue presented by this case, the Supreme Court has construed "uses" in § 924(c)(1) to have a meaning broader than brandishment or display. *Smith v. United States*, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). The majority of federal courts that have defined "uses" in that statute have held that a firearm is "used," for purposes of the statute, if possession is an integral part of the predicate offense or if the firearm is within easy reach and available to protect the user during the ongoing drug trafficking offense. *See, e.g., United States v. Abreu*, 962

9. The Supreme Court has very recently held that "use" of a firearm may consist of conduct other than possession, brandishment, or display. In *Smith v. United States*, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), it concluded that trading a firearm for drugs is "using" a firearm within the contemplation of the federal counterpart to section 281A(b). That holding is not contrary to the result we reach here, however.

F.2d 1425, 1431 (10th Cir.1992) (a defendant "uses" a firearm when he or she has ready access to the firearm and the firearm was an integral part of the criminal undertaking); *United States v. Duke*, 940 F.2d 1113, 1119 (8th Cir.1991) (guns found in house where defendant stored and processed drugs were "used" if their availability increased likelihood criminal undertaking would succeed); *United States v. Harrison*, 931 F.2d 65, 71 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991) (constructive possession of a firearm is sufficient to establish a violation of § 924(c)(1) if the firearm is within easy reach and available to protect the user during an ongoing drug trafficking offense); *United States v. Paz*, 927 F.2d 176, 178–79 (4th Cir.1991) (evidence that gun was present and accessible and that its presence would help facilitate success of criminal undertaking was sufficient to support defendant's conviction for use of firearm during and in relation to drug trafficking, even though gun was under mattress); *United States v. Brown*, 915 F.2d 219, 224 (6th Cir.1990) (evidence of use sufficient where defendant admitted carrying a pistol to protect his curbside drug sales); *United States v. Bullock*, 914 F.2d 1413, 1416 (10th Cir.1990) (defendant could be convicted for "use" of firearm in commission of drug trafficking crime, even though he did not have firearm on his person at time he was arrested; there were guns in virtually every room of the defendant's house, with a loaded shotgun on bed within a few feet of the defendant); *United States v. Vasquez*, 909 F.2d 235, 239 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (guns kept in trunk of car with cocaine stash in locked garage were "used"); *United States v. Alvarado*, 882 F.2d 645, 653 (2nd Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990) (evidence was sufficient to sustain conviction for using and carrying firearms during and in relation to drug crimes; several loaded firearms in the defendant's apartment were strategically located to protect substantial quantities of cocaine that were packaged and sold in the apartment and to provide added security); *United States v. Meggett*, 875 F.2d 24, 29 (2d Cir.1989) (the defendant may "use" a firearm

for purposes of statute prohibiting use of a firearm during a drug-trafficking crime without firing, brandishing, or displaying it; possession of a gun, even if it is concealed, constitutes use if that possession is an integral part of the predicate offense and facilitates the commission of the offense). *Accord United States v. Cummings*, 937 F.2d 941, 943 (4th Cir.), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 395, 116 L.Ed.2d 345 (1991) (Conviction of possession of handgun during and in relation to drug trafficking offense was sufficiently supported by evidence that the defendant routinely carried weapon on his person, that he had the weapon during the drug transaction with informant, and that he brandished the weapon while attempting to escape); *United States v. Theodoropoulus*, 866 F.2d 587, 597–98 (3d Cir.1989) (Although openly displayed firearm in apartment used by drug traffickers was sufficient to constitute "use", existence of disassembled weapons in trash can on apartment porch were not). *But see United States v. Bruce*, 939 F.2d 1053, 1055–56 (D.C.Cir.1991) (Gun that was hidden in belt buckle in paper bag alongside drugs in pocket of raincoat hanging in closet was not "used" in relation to possession of drugs with intent to distribute); *United States v. Edwardo-Franco*, 885 F.2d 1002, 1011–11 (2d Cir.1989) (There was no evidence to connect the defendant in any way with the guns other than his testimony that they were in bedroom closet when he arrived at the house); *United States v. Feliz-Cordero*, 859 F.2d 250, 254 (2d Cir.1988) (Evidence that the defendants kept firearm in bedroom dresser drawer was insufficient to sustain conviction for carrying or using firearm during or in relation to a drug trafficking crime).

We stated earlier that section 281A(b), though similar in language to § 924(c)(1), contains language identical to section 36B, and "use" in that statute has been interpreted, by this Court, as requiring conduct different from possession—an active, rather than passive, employment of a handgun. That interpretation, of which the Legislature was aware when it enacted section 281A(b), conflicts with the way "use" has been interpreted by the majority of the federal courts construing § 924(c)(1). The interpretation given a federal

statute ordinarily is persuasive in interpreting a state statute patterned upon the federal statute. *Faulk v. State's Attorney,* 299 Md. 493, 506, 474 A.2d 880, 887 (1984). *And see Atlantic Sea–Con v. Robert Dann Co.,* 321 Md. 275, 262, 582 A.2d 981, 984 (1990). In the case *sub judice,* not only is the authority interpreting the federal statute not uniform, but the legislative history of the state statute suggests that a different meaning of "uses" was intended, since the Legislature chose to use the same language in section 281A(b) as it had used in section 36B, knowing the gloss we had put on the latter. It follows that the General Assembly did not intend to equate "uses" with "possesses" as the majority of federal courts have done. This is particularly so where, as here, the Legislature amended the statute specifically to delete "possess" and replaced it with terms that are not, in all circumstances, its equivalent. We are obliged to follow the intent of the Legislature. *See Motor Vehicle Admin. v. Seidel Chevrolet, Inc.,* 326 Md. 237, 248, 604 A.2d 473, 479 (1992); *Ayres v. Townsend,* 324 Md. 666, 672, 598 A.2d 470, 473 (1991); *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188, 191 (1990). If "possession" of a firearm in relation to a drug trafficking crime is to be punished, the Legislature must clearly so provide, not we. *See Webb v. State,* 311 Md. 610, 618, 536 A.2d 1161, 1165 (1988).

As we see it, "use" requires that the defendant "carry out a purpose or action" or "make instrumental to an end or process" or "apply to advantage" the firearm. *Wynn,* 313 Md. at 543, 546 A.2d at 476. When discovered, the appellant did not have a firearm on his person, in fact, all the firearms were recovered one floor removed from the appellant. We will neither "stretch the meaning of 'use' to include 'non-use' ", *see Chouinard,* 603 P.2d 745, nor extend the statute to reach cases not plainly within its contemplation. *Ball v. United Parcel Service, Inc.,* 325 Md. 652, 658, 602 A.2d 1176, 1179 (1992); *Bacon v. State,* 322 Md. 140, 149, 586 A.2d 18, 23 (1991); *Davis v. State,* 319 Md. 56, 61, 570 A.2d 855, 858 (1990).

**158**

## III.

Maryland Rule 1–351 provides:

> No court shall sign any order or grant any relief in an action upon an ex parte application unless:
>
> (a) an ex parte application is expressly provided for or necessarily implied by these rules or other law, or
>
> (b) the moving party has certified in writing that all parties who will be affected have been given notice of the time and place of presentation of the application to the court or that specified efforts commensurate with the circumstances have been made to give notice.

Without notifying either the appellant or his attorney of its intention to do so, the State petitioned the trial court, while the trial was in progress, but before the appellant testified, "to sign an Order directing the Custodian of Maryland Income Tax Records ... to produce the [appellant's] Maryland Income Tax Records for the taxable years *1988 through including 1990.*" The Petition For Order Authorizing Production of Tax Records recited three bases for the Order:

> 1. The aforementioned person(s) are defendants in the above captioned criminal cases involving the seizure of records of an extensive illegal lottery scheme operating in Baltimore City.[10]
>
> 2. Pursuant to Section 13–203 of the Tax General Article, Annotated Code of Maryland, the Custodian of Maryland Income Tax Records shall not divulge such tax records unless directed to do so by proper judicial order.
>
> 3. The records are requested by the State in order to prepare properly for the trial....

The only party before the court, as far as the record reveals—there being no transcript of the proceeding—was the State. The order signed by the judge recited that "good cause" exists for its issuance.

---

**10.** The appellant was not charged with illegal lottery.

The appellant argues that, by meeting with the State *ex parte* and signing an order, presented during those proceedings, directing the custodian of Maryland income tax records to deliver the appellant's income tax returns to the State, the judge violated Rule 1–351. He also argues that the failure of the State to provide notice of those proceedings either to him or his lawyer had the effect of excluding him from a stage of his trial; hence, Rule 4–231 was also violated.[11] When these rule violations are taken together, the appellant contends, the effect of the *ex parte* hearing was to deny him the ability to make "an informed choice to testify or remain silent." Finally, the appellant asserts that precluding him from participating in the proceedings to obtain his income tax returns was at least fundamentally unfair.[12]

An *ex parte* proceeding is one in which only one side of the controversy is presented, the other side having been afforded no opportunity to participate by virtue of the absence of notice or knowledge of the proceedings. *See Magness v. Magness,* 79 Md.App. 668, 677, 558 A.2d 807, 811, *appeal dismissed,* 317 Md. 641, 566 A.2d 102 (1989) (Rule 1–351 is meant "to protect against the fundamental unfairness of one party approaching a judge and obtaining an order without first according an adversary a chance to present his or her own position"). *And see* Paul V. Niemeyer and Linda M. Richards, *Maryland Rules Commentary,* 41 (1984). The proceedings in which the court signed the order directing disclosure of the appellant's Maryland State income tax returns were *ex parte* proceedings.

---

11. Maryland Rule 4–231(b) provides:

> (b) *Right to Be Present—Exceptions.*—A defendant is entitled to be present at a preliminary hearing and every stage of the trial, except (1) at a conference or argument on a question of law; (2) when a nolle prosequi or stet is entered pursuant to Rules 4–247 and 4–248; or (3) at a reduction of sentence pursuant to Rules 4–344 and 4–345.

12. The appellant also alleges that Rule 4–263, pertaining to discovery, was violated when he was not apprised of the *ex parte* proceedings. He does not, however, state the manner, and we can discern none, in which such a violation could have occurred in this case; accordingly, we shall not further address this issue.

 The State sought access to the appellant's income tax returns pursuant to Maryland Code (1988) §§ 13–202 and 13–203(b) of the Tax General Article.[13] Read together, these sections prohibit disclosure of tax information except "in accordance with a proper judicial order or a legislative order." It was in an attempt to obtain a "proper judicial order" that the State presented the court with the Petition For Order Authorizing Production of Tax Records.[14]

---

**13.** Section 13–202 provides:

Except as otherwise provided in this subtitle, an officer, employee, former officer or former employee of the State or of a political subdivision of the State may not disclose, in any manner, any tax information.

Section 13–203(b) provides:

(b) *Judicial or legislative order.*—Tax information may be disclosed in accordance with a proper judicial order or a legislative order.

**14.** The State quite properly did not subpoena the appellant's income tax returns; it recognized, correctly, that, for purposes of section 13–203, a subpoena is not "a proper judicial order." The clerk of a court is charged with the duty of issuing subpoenas, *see* Md. Rule 4–265, and that duty, like other clerical duties, is generally classified as ministerial. *See also Corey v. Carback,* 201 Md. 389, 402, 94 A.2d 629, 630 (1953).; *Director of Finance v. Harris,* 90 Md.App. 506, 513, 602 A.2d 191, 192 (1992), quoting *McCray v. Maryland,* 456 F.2d 1, 4 (4th Cir.1972). A party seeking the issuance of a subpoena need not justify the request; he or she is not required to show cause why it should issue. On the other hand, records or information that are confidential may not be obtained by subpoena, without more. Such records may be obtained only upon a showing of need, *see Zaal v. State,* 326 Md. 54, 87, 602 A.2d 1247, 1264 (1992), and relevance. *See DonBullian v. DeLisa,* 246 Md. 734, 230 A.2d 349 (1967). In *DeLisa,* after assuming that a subpoena, which issues as a matter of course, even though over the signature of the Chief Judge, was not a proper judicial order, we observed:

[T]he Comptroller without objection produced the return in court and his representative, in obedience to the statute, would reveal the .contents of the return only to the judge who, under the circumstances, was "an officer of the State having a right thereto in his official capacity." The judge's ruling which found the return relevant evidence and admitted it in evidence was a "proper ... judicial order" under the statute.

246 Md. at 738, 230 A.2d at 351.

It may be deduced from the foregoing that a proper judicial order is one that orders disclosure of the records sought only after a judge, having considered the matter in light of the total circumstances, *i.e.,* the records sought, the issue on which it is alleged they have bearing, etc., has determined that they are relevant. In other words, a proper

To be sure, a party to ongoing litigation may subpoena, without advance notification having to be given to the other party, a third party's records for use at the trial. When, however, the records sought are "confidential", before disclosure will be ordered, the moving party must show, usually at a hearing, some connection between the records sought, the issue before the court, and the likelihood that information relevant to the trial would be discovered. *Zaal v. State*, 326 Md. 54, 83, 602 A.2d 1247, 1261 (1992).

What was at stake in the *ex parte* proceedings sub judice, was the discovery of evidence for use at the petitioner's trial, not the admissibility at trial of the evidence discovered. A defendant has an undeniable and real stake in challenging the admissibility of impeachment evidence that the State might offer against him or her. On the other hand, ordinarily, he or she may not veto the State's discovery of the potentially impeaching evidence.

We need not decide whether, by failing to give the appellant notice of the *ex parte* proceedings, Rule 1–351 was violated.[15]

---

judicial order issues after the judge has exercised discretion to determine the relevance of the records, not as a matter of course.

**15.** Recognizing that a subpoena issued by a clerk is not "a proper judicial order," as contemplated by section 13–203, the State argues that a court order stating that there is good cause, issued by a judge, even though without either a hearing or a finding that the records sought are relevant, is such an order. The State's position, then, is that confidential records may be obtained almost as a matter of course. Preservation of confidentiality requires more.

In the case *sub judice*, early in the trial, the State, in an *ex parte* proceeding, obtained an order authorizing disclosure of the appellant's income tax returns. At that time, the appellant had not testified, and so, the State could not have been seeking them to impeach the appellant's testimony. The petition submitted to the court stated that the returns were needed to permit the State properly to prepare for the appellant's trial, which, the petition alleged, involved an extensive lottery scheme operating in Baltimore City. Aside from supplying the nature of the case against the defendant (in this case, that information was also erroneous), the petition disclosed nothing from which the court could conclude that the returns were relevant except, perhaps, on the issue of the appellant's poverty. That would not have justified the disclosure of the information, however. *See Vitek v. State*, 295 Md. 35,

Assuming that it was, under the circumstances, the violation had no prejudicial impact on the appellant. The appellant had the opportunity to, and, in fact did, object to the admission of the tax records into evidence. He could have raised, at that time, the confidentiality of those records. Certainly, before the records were admitted, their relevance to the issue as to which they were offered had been established. Furthermore, a proceeding for the purpose of discovering impeachment evidence for use at trial is not a stage of the appellant's trial; rather it is collateral and totally separate from it.[16] *See Department of Social Services v. Stein,* 328 Md. 1, 12–13, 612 A.2d 880, 885–86 (1992).

## IV.

By allowing the State to cross-examine him as to his Maryland tax returns, the trial court erred, the appellant asserts, because the cross-examination was designed to show his poverty, and, thus, his motive.[17] He relies on *Vitek v. State,* 295 Md. 35, 453 A.2d 514 (1982). In that case, we held that, because poverty generally cannot be proven to show motive, it was error for the prosecutor to inquire into the financial

---

40, 453 A.2d 514, 516–17 (1982). Because, however, notice of the proceedings was never given to anyone and no hearing was held, there never was any opportunity for this fact to be pointed out.

**16.** We do not today decide whether the person for whose benefit the confidentiality of the records exists must be notified of the separate proceedings notwithstanding the fact that a defendant is not entitled to know, in advance, what evidence the State intends to use to impeach him or her. *See* Maryland Rule 2–422; *Hoey v. State,* 311 Md. 473, 488–87, 536 A.2d 622, 629 (1988). *See* also Lynn McLain, *Maryland Evidence,* § 503.16 (1987).

**17.** The appellant also contends that the cross-examination was intended to prove that he committed prior bad acts. He does not explain how, precisely, cross-examining a witness as to his income tax returns is intended to prove prior bad acts. Given the view we take of the appellant's initial argument, it does not matter. We believe the cross-examination was permitted on a contested, relevant issue in the case and any implication of the commission of prior bad acts that may be drawn is substantially outweighed by its probative value. *Harris v. State,* 324 Md. 490, 499, 597 A.2d 956, 961 (1991).

situation of the appellant. *Id.* at 40, 453 A.2d at 516–17. We noted, however, that evidence of a defendant's financial condition may be admissible under special circumstances. *Id.* at 41–46, 453 A.2d at 516–19.

On direct examination, the appellant testified that shortly before his arrest and prior to an accident, he had been "making some money in the store." [18] By that testimony, the appellant portrayed himself as an enterprising businessman who did not need to sell drugs. The State was entitled to rebut that implication, if it could. Cross-examining the appellant as to his 1989 and 1990 tax returns, was an effective method of doing so. It sought by that examination to show that the appellant did not earn enough from his businesses to support himself or his family. Although the cross-examination tended to prove that the appellant likely had another source of income, and did not live off the proceeds of his businesses alone, as his direct testimony suggested, it did not suggest, nor was it presented to prove, that the appellant was more likely to commit a crime because he was poor. The court did not abuse its discretion in permitting the State to cross-examine the appellant as to his State tax returns. *State v. Cox*, 298 Md. 173, 183, 468 A.2d 319, 324 (1983); *Smith v. State*, 273 Md. 152, 157, 328 A.2d 274, 277 (1974).

*JUDGMENT ENTERED PURSUANT TO ART. 27, § 281A(b) REVERSED; ALL OTHER JUDGMENTS AFFIRMED.*

*COSTS TO BE PAID ONE–HALF BY THE MAYOR & CITY COUNCIL OF BALTIMORE AND ONE–HALF BY THE APPELLANT.*

---

**18.** The appellant operated a carry-out restaurant and car repair shop at the Thomas Street address.